**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **Jane Doe,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **No. 3:25-cv-00266-MPK** |
| | : | |
| **United States of America; GEO Secure** | : | **Jury Trial Demanded** |
| **Services, LLC; Mark Melhorn; and M. Koegler,** | : | **(As to Counts 3 through 11)** |
| | : | |
| **Defendants.** | : | |
| | : | |

## AMENDED COMPLAINT[1]

### I.    Preliminary Statement

1.     This action concerns the extraordinary misconduct of agents of the United States and a private prison provider, GEO Secure Services, LLC (GEO), allowing a detention facility chaplain, under the guise of providing pastoral services, to engage in repeated and pervasive sexual abuse of women detained in immigration custody at the Moshannon Valley Processing Center (MVPC).

2.     The United States, GEO, and their officers knew from multiple reports that the chaplain, defendant Mark Melhorn, had engaged in sexual misconduct directed at female employees and detainees. They also knew that they had a legal obligation and duty to fully investigate allegations of such misconduct and to take necessary steps to prevent that abuse.

---

[1] Plaintiff submits this amendment of her Complaint as a matter of course pursuant to Fed. R. Civ. P. 15(a)(1)(A).

3.      Despite this knowledge, they failed to act. As a result, when plaintiff Jane Doe

(Ms. Doe) was transferred by immigration authorities to MVPC, she was vulnerable to sexual

abuse.

4.      As a devout person who placed great emphasis on her faith while detained in

immigration custody, Ms. Doe initially believed Melhorn's work as a chaplain at MVPC would

provide her with important pastoral services and promote the exercise of her religion. She trusted

Melhorn and looked forward to meeting with him to discuss Bible verses, sing hymns, and

engage in religious observance.

5.      Melhorn, however, acting consistently with what MVPC's officers knew from

previous reports, violated that trust and engaged in a prolonged and persistent campaign of

sexual abuse directed at Ms. Doe. He started with sexualized gestures and comments about Ms.

Doe's body and staring at her while she was dressing, showering, or using the bathroom. His

conduct progressed to unwanted touching, and, eventually, Melhorn forced himself on Ms. Doe,

entering her cell, where he placed his hands on her vagina and forced her to touch his erect penis.

6.      Ms. Doe was terrified to report these incidents due to Melhorn telling her that no

one would believe her. After a mental health practitioner who observed Ms. Doe's extreme

anxiety urged her to tell the truth, Ms. Doe finally described what Melhorn had done to her.

7.      Her disclosure resulted in the initiation of an investigation under the Prison Rape

Elimination Act—a process that, as federal law mandates, must involve a comprehensive review

of available evidence. Despite that requirement, MVPC's PREA investigator, defendant M.

Koegler, conducted minimal investigation and baselessly deemed Ms. Doe's allegations

"unsubstantiated." As a result, she allowed Melhorn's conduct to continue unabated, and,

thereafter, Melhorn had additional contact with Ms. Doe, engaging in further sexual abuse.

8. This conduct caused substantial damages for Ms. Doe. She experienced extreme emotional pain and suffering, manifesting in anxiety, nightmares, and difficulty sleeping, resulting, ultimately, in a diagnosis of Post-Traumatic Stress Disorder.

9. Ms. Doe brings this action to obtain compensation for these harms and losses. She asserts claims under the Federal Tort Claims Act, Pennsylvania state tort law, and the Religious Freedom Restoration Act.

## II.    Jurisdiction and Venue

10. The Court has jurisdiction over the subject matter of the claims asserted under the Federal Tort Claims Act in Counts 1 and 2 pursuant to 28 U.S.C. § 1346(b).

11. On or about February 20, 2025, Ms. Doe submitted an Administrative Tort Claim to U.S. Immigration and Customs Enforcement ("ICE") and the U.S. Department of Homeland Security ("DHS"). On August 6, 2025, the claim was denied, and Ms. Doe has exhausted the claims in Counts 1 and 2.

12. The Court has diversity jurisdiction over the subject matter of the claims asserted under Pennsylvania tort law in Counts 3 through 10 of this Complaint pursuant to 28 U.S.C. § 1332. Ms. Doe is a citizen of the Dominican Republic, a "foreign state," and is domiciled in New Jersey. All defendants are citizens of states other than New Jersey. The amount in controversy, including the value of Ms. Doe's emotional pain and suffering, exceeds $75,000.

13. The Court has federal-question jurisdiction over the subject matter of the claim under the Religious Freedom Restoration Act asserted in Count 11 of this Complaint pursuant to 28 U.S.C. § 1331.

14.     Venue is proper in this District under 28 U.S.C. §§ 1391(b) & 1402(b) as the actions at issue in this matter occurred in Clearfield County, located within the Western District of Pennsylvania.

**III.    Parties**

15.     Plaintiff Jane Doe was at all times relevant to this Complaint a citizen of the Dominican Republic. She is a resident of Pennsauken, New Jersey.

16.     Defendant United States of America is the appropriate defendant under the Federal Tort Claims Act.

17.     Defendant GEO Secure Services, LLC (GEO) is a division of The GEO Group, Inc., which was at all times relevant to this Complaint headquartered in Boca Raton, Florida and a citizen of Florida. GEO operated MVPC and employed and/or contracted with defendants Melhorn and Koegler.

18.     Defendant Mark Melhorn was at all times relevant to this Complaint an employee, contractor, and/or volunteer of GEO assigned to provide chaplaincy services at MVPC. Melhorn is a citizen of Pennsylvania. He is sued in his individual capacity.

19.     Defendant M. Koegler was at all times relevant to this Complaint an employee and/or contractor of GEO assigned to serve as the PREA coordinator at MVPC. Koegler is a citizen of Pennsylvania. She is sued in her individual capacity.

20.     At all times relevant to this Complaint, defendants Melhorn and Koegler were acting within the scope and course of their employment/contracting/volunteering arrangement with GEO.

21.     At all times relevant to this Complaint, all defendants acted in concert and conspiracy and were jointly and severally responsible for the harms caused to Ms. Doe.

IV.    **Factual Allegations**

A.    **ICE and GEO's Legal Obligations to Protect Detainees from Sexual Abuse**

22.    DHS is the federal department responsible for implementing and enforcing the immigration laws, and ICE is the agency within DHS responsible for the detention of noncitizens.

23.    ICE directives, as set forth in, among other sources, the Performance-Based National Detention Standards 2011 (PBNDS 2011), require ICE to detain people in the most humane manner possible.

24.    Throughout 2023 and 2024, defendant GEO held a contract to detain noncitizens at MVPC. The contract incorporated various binding regulations and standards, including the PBNDS 2011.

25.    A critical component of mandatory responsibilities placed upon ICE and GEO by relevant regulations and the PBNDS 2011 is the protection of people detained at MVPC from sexual harassment and abuse.

26.    These obligations are derived from the Prison Rape Elimination Act (PREA), a Congressional act intended to eradicate rape and sexual abuse in correctional and detention facilities.

27.    DHS regulations provide that ICE is fully committed to a zero-tolerance standard for sexual abuse in detention facilities and to robust oversight of such facilities to ensure compliance with this requirement.

28.    As part of that commitment, DHS's regulations define sexual abuse broadly to include touching and other nonconsensual contact, threats and abusive language, repeated sexual comments, and voyeuristic acts by facility staff, contractors, and volunteers.

29. The regulations impose on contractors and detention facilities, like GEO and MVPC, a detailed set of requirements regarding responses to allegations of sexual abuse including, among other things, mandates for:

    a. A prompt investigation;

    b. The availability of interpretation services for a victim alleging sexual abuse;

    c. The provision of resources for sexual abuse victims, including information about the availability of U nonimmigrant status for victims of crime;

    d. Reporting to ICE regarding all allegations of sexual abuse;

    e. Reporting to ICE when any detainee is placed in segregation housing due to vulnerability to sexual abuse; and

    f. Immediate action to protect a detainee when there is reason to believe the detainee is at risk of imminent sexual abuse.

30. The regulations also mandate that ICE ensure the proper investigation of all reported incidents of sexual abuse in detention facilities, including facilities operated by contractors like GEO.

**B.    The Failure of ICE and GEO to Respond to and Remedy Allegations of Sexual Abuse at MVPC**

31. In August 2022, a year before plaintiff Jane Doe was transferred to MVPC, DHS's Office of Civil Rights and Civil Liberties (CRCL) conducted a "spot-check" at that facility.

32. It did so in response to a concerning number of reports of sexual assault and harassment at MVPC.

33.    In the spot-check, CRCL found that GEO and its staff at MVPC were not adhering to multiple requirements of the PBNDS 2011 and other directives they were mandated to follow.

34.    The violations of directives identified by CRCL included:

    a.  Failure to provide support services for victims of sexual abuse during investigative interviews, including at least one case where MVPC staff claimed a report was "unfounded" even though they never interviewed the alleged victim;

    b.  Failure to provide interpretive services to non-English speaking detainees alleging sexual abuse;

    c.  Failure to educate women about the facility's zero tolerance policy for sexual abuse; and

    d.  Failure to educate women about reporting and investigation procedures for claims of sexual abuse.

35.    CRCL also identified significant issues in the MVPC surveillance camera system. It located many blind spots—locations not shown on camera—which hampered efforts to corroborate allegations of sexual abuse.

36.    CRCL determined that ICE had not sufficiently trained facility staff responsible for PREA reporting, investigation, and compliance.

37.    Consistent with that lack of training, CRCL found that MVPC staff investigating allegations of sexual abuse failed to preserve video surveillance footage, interview witnesses, and gather circumstantial evidence that would corroborate allegations.

38.    ICE, GEO, and staff at MVPC were made aware of CRCL's findings.

39.    In May 2023, ICE informed CRCL that it would review cost assessments for additional surveillance camera coverage and provide specialized training to MVPC staff regarding the investigation of sexual abuse allegations.

40.    Between May 2023 and August 2023, however, ICE and GEO failed to adequately address the need for additional camera coverage and specialized training for MVPC staff regarding the investigation of sexual abuse allegations.

**C.    MVPC Chaplain Mark Melhorn Engages in a Sustained and Escalating Pattern of Sexually Abusive Conduct Directed at Plaintiff Jane Doe**

41.    On August 21, 2023, six months after ICE had pledged to address the serious deficiencies identified by CRCL regarding the prevention and investigation of sexual abuse at MVPC, ICE transferred Ms. Doe to MVPC. She was assigned to a cell in the women's housing unit.

42.    Defendant Mark Melhorn was a chaplain at the facility.

43.    Melhorn went to the women's housing unit every weekday afternoon. He did so for the purported purpose of providing pastoral services to residents of the unit.

44.    Melhorn also conducted a church service for all women detained at MVPC at least one evening each month.

45.    Ms. Doe met Melhorn within a few days of arriving at MVPC.

46.    Ms. Doe is a religious Christian. She placed great reliance on her faith while she was detained, and, upon meeting Melhorn, she was comforted to know that a chaplain was available to provide religious guidance.

47.    Ms. Doe asked Melhorn to bring her a Bible, and he did so.

48.     Thereafter, Melhorn asked Ms. Doe to interpret for him with other detained women. Ms. Doe spoke limited English but felt obligated to comply with Melhorn's request because many other detained women spoke no English.

49.     Shortly after Ms. Doe first met Melhorn, he began to make sexualized comments and gestures to her.

50.     He repeatedly commented on her appearance, telling her she was "gorgeous" and "beautiful" in English and then, later, after he learned the words in Spanish, calling her "hermosa," "bonita," and "preciosa."

51.     Melhorn would ask Ms. Doe if she liked how he looked, stare at her breasts, and lick his lips while staring at her.

52.     While Melhorn and detained women sang hymns together, he would position himself so that he could stare at Ms. Doe from behind. When she tried to change her position so that he could not stare at her from behind, he would change his position and continue staring at her.

53.     Melhorn's staring at Ms. Doe was open and obvious. Other women who were present while singing hymns commented to Ms. Doe about Melhorn's actions.

54.     Melhorn began to go out of his way to touch Ms. Doe. On several occasions, he entered her cell to give her sheets of paper with Bible passages; instead of handing the papers to her, he would place them on her lap and touch her inner thigh.

55.     He would also stroke her hand when passing her a Bible or other items.

56.     On several occasions, Melhorn watched Ms. Doe in a state of undress.

57.     On the first such occasion, in or around October 2023, Ms. Doe was shaving her pubic hair while standing behind a magnetic privacy screen in her cell when she noticed a

silhouette on the other side of the screen. At first, she believed it was her roommate and was not concerned, so she showered. When she got out of the shower, however, she saw that her roommate was asleep and that Melhorn was standing on his toes so that he could see Ms. Doe over the screen.

58.    Ms. Doe discussed this disturbing encounter with other detained women, including women residing in cells on the opposite side of the hallway from her cell. Those women told Ms. Doe that they had noticed Melhorn regularly peering at her from outside the cell.

59.    Melhorn's conduct continued through February and March of 2024. Then it escalated to forceful and more invasive touching.

60.    On several occasions, Melhorn approached Ms. Doe from behind. He would place his hands on her head, as if he was praying for her, and then run them down the sides and back of her body.

61.    On or about March 29, 2024, his conduct grew even more extreme.

62.    Melhorn entered Ms. Doe's cell while she was sleeping. He woke her up and then placed his hand under the sheets of her bed to touch her buttocks, breasts, and crotch.

63.    Ms. Doe was terrified and got up abruptly. Melhorn immediately warned Ms. Doe not to report him.

64.    He told her no one would believe her. Ms. Doe thought this was true and decided not to report Melhorn's actions to anyone.

65.    Because Ms. Doe did not report Melhorn, his conduct continued and worsened.

66.    On or around April 8, 2024, he used the pretext of giving Ms. Doe religious pamphlets to enter her cell while she was sitting on her bed, the bottom of a two-level bunk bed.

67.     Melhorn placed himself in front of Ms. Doe. She felt trapped and believed she could not leave the cell because of the top bunk above her and the wall behind her.

68.     Melhorn began to make sexually explicit comments. He touched her breasts, her inner thighs, and her buttocks. Eventually, he touched her vagina.

69.     He stood in front of her with his penis erect inside his pants at her eye level. He forced her to touch his erect penis.

70.     Melhorn's conduct was interrupted by Ms. Doe's roommate returning to the cell. Ms. Doe immediately left the cell and went to the unit common area.

71.     Melhorn followed her and forcibly touched her. He hugged her, pressing his erect penis into her and groping her breasts.

72.     Melhorn again warned Ms. Doe against reporting him, and stated that even if she did, nothing would happen. He told her that other women had tried to report him, but no one had believed those women.

73.     Again, Ms. Doe believed her complaints would not be addressed, so she did not report Melhorn's actions.

74.     A week later, on or around April 15, 2024, Melhorn approached Ms. Doe while she was standing in a corner in the housing unit. She had been showering in her cell when a fight occurred between residents, including her cellmate. Officers responded to the fight and were imposing discipline on the involved women. Ms. Doe was required to leave her cell while officers addressed her cellmate. Having just gotten out of the shower, Ms. Doe was wearing boxer shorts.

75.     Melhorn professed concern for Ms. Doe. He told her he was scared she had been involved in the fight.

76.    Ms. Doe, uncomfortable with Melhorn's attention, walked to a common area and sat down next to another detained woman in an effort to discourage Melhorn from touching her. But Melhorn followed her, sat down next to her, and touched her leg.

**D.    MVPC's Sham PREA Investigation of Ms. Doe's Allegations**

77.    On April 16, 2024, Ms. Doe had a mental health visit with a licensed clinical social worker at MVPC.

78.    Ms. Doe had been seeing MVPC mental health staff since shortly after her arrival in August 2023. Practitioners who saw Ms. Doe documented that she was suffering from anxiety and depression and that she had difficulty sleeping. She was prescribed medication for those conditions.

79.    Ms. Doe's difficulty sleeping arose from repeated nightmares she had about Melhorn.

80.    In the April 16, 2024, visit, Ms. Doe asked the practitioner for a change in medication that would help her sleep.

81.    The practitioner questioned why Ms. Doe was having trouble sleeping and assured her that whatever she said would remain confidential. Up to that point, Ms. Doe had not told any MVPC staff about Melhorn's conduct because of his warnings to her. However, based on the practitioner's assurances, Ms. Doe told the practitioner that Melhorn had sexually harassed and abused her.

82.    The practitioner said she was obligated to submit a PREA report based on Ms. Doe's allegations of sexual abuse. The practitioner advised Ms. Doe that she was glad Ms. Doe made the report because Melhorn had done things like this before.

83.    In connection with the PREA report, Ms. Doe was seen by a nurse. She told the nurse about an incident in which Melhorn came into her cell right after she had showered and sat on her bad and touched her leg and buttocks.

84.    The nurse told Ms. Doe that Melhorn was a "pervert" and that this was widely known at the facility.

85.    Later that same day, two people—MVPC PREA coordinator M. Koegler and a male investigator—interviewed Ms. Doe concerning her complaints about Melhorn.

86.    They conducted the interview in English and without an interpreter. The interview was short and consisted of only a few questions. Ms. Doe informed the investigators that she believed most of the incidents with Melhorn took place in areas of the facility not captured by surveillance cameras.

87.    The interviewers asked no follow up questions in response to Ms. Doe's answers. Nor did they provide Ms. Doe with available resources for sexual assault victims.

88.    Following the interview, Koegler purportedly initiated a PREA investigation, as required by DHS regulations applicable to ICE and GEO.

89.    Once Koegler initiated the investigation, Melhorn was removed from the women's housing area, and Ms. Doe had no contact with him.

90.    While the investigation was pending, Ms. Doe continued to meet with mental health practitioners at MVPC. In those encounters, practitioners consistently documented Ms. Doe's complaints about Melhorn's conduct and noted, among other things, that Ms. Doe was exhibiting anxiety resulting from trauma.

91.    Additionally, while the investigation was pending, a female MVPC officer approached Ms. Doe and confided in her that she too had complained about Melhorn and that she

was aware of another female employee who also had done so. The previous incidents with Melhorn, the officer explained, concerned Melhorn entering areas where female staff members were changing clothes or using the bathroom—areas not captured by surveillance cameras. The officer who approached Ms. Doe explained that once she complained, MVPC supervisors assured her she would not be assigned to work shifts at the same time or in the same location as Melhorn.

92.    On May 8, 2024, Koegler prepared a written form stating that Ms. Doe's PREA complaint was "unsubstantiated." According to the form, this meant that the investigation determined that the allegations may have been truthful, but there was insufficient evidence to prove the allegations. The document stated that the complaint had been investigated by both GEO and the Pennsylvania State Police.

93.    Ms. Doe had no recollection of speaking with anyone who identified themselves as a representative of the Pennsylvania State Police.

94.    Koegler shared the results of the investigation with Ms. Doe on May 9, 2024. She did so in English, without an interpreter.

95.    Koegler told Ms. Doe that the complaint was unsubstantiated because the facility's cameras did not capture an incident described by Ms. Doe, and Ms. Doe replied that she had already reported that most of the incidents happened in areas where there were no cameras.

96.    Even without surveillance video footage to support Ms. Doe's description of Melhorn's conduct, there was ample corroborative evidence available to investigators, including the following:

a.  At least one other woman detained at MVPC had informed an officer in the women's unit that she saw Melhorn walk into Ms. Doe's cell while Ms. Doe was naked;

b.  At least two female officers had previously complained about Melhorn's sexual abuse in areas not captured by video surveillance cameras;

c.  Melhorn was widely known among mental health and medical staff as a "pervert" who had engaged in repeated sexual misconduct; and

d.  Multiple women detained at MVPC observed Melhorn's conduct with Ms. Doe, including his staring at her during religious services and his peering into her cell.

97.    In deeming Ms. Doe's allegations "unsubstantiated," Koegler failed to consider or further investigate any of this evidence in violation of binding PREA regulations.

98.    Koegler told Ms. Doe that because the claim was unsubstantiated, Melhorn would be permitted to return to the women's housing unit.

99.    As a result of Koegler's insufficient investigation, Ms. Doe was placed at further risk of additional sexual abuse by Melhorn.

100.    The fact that her allegations had been ignored and that she would be exposed to additional interactions with, and abuse by, Melhorn left Ms. Doe terrified.

101.    Throughout May and June 2024, Ms. Doe continued to see mental health practitioners and provided consistent accounts of the extreme anxiety she was suffering. The practitioners who saw Ms. Doe documented her persistent trauma responses when discussing Melhorn.

**E.      Melhorn is Permitted to Sexually Abuse Ms. Doe Yet Again**

102.    During the PREA investigation process, some of the women in Ms. Doe's housing unit were angry that Melhorn no longer came to the unit to provide them with religious materials and pastoral services. These women called Ms. Doe a "snitch," harassed her, and threatened to harm her.

103.    Ms. Doe reported the harassment and threats. On July 4, 2024, she was removed from her housing area and placed in protective custody in the medical infirmary unit.

104.    The next day, July 5, Melhorn found Ms. Doe in the protective custody area.

105.    He arrived outside her cell as she was using the bathroom.

106.    The cell had no privacy screen, and Melhorn stood immediately outside the cell watching Ms. Doe while she used the bathroom.

107.    Melhorn sang Ms. Doe's name and asked her what she had done to end up in protective custody.

108.    Ms. Doe, frightened, immediately yelled out for an officer. MVPC Officer Cotter arrived and saw Melhorn outside Ms. Doe's cell. Melhorn left the area. At Ms. Doe's request, Officer Cotter summoned a supervisor.

109.    In response, MVPC Captain Hampton arrived.

110.    Hampton told Ms. Doe he would investigate Melhorn's actions and that he would return to speak with Ms. Doe.

111.    Hampton never returned to speak with Ms. Doe.

112.    Over the next several days, Ms. Doe asked multiple officers for an opportunity to speak with Koegler so that she could initiate another PREA complaint. Koegler did not, however, come to speak with Ms. Doe.

F.    **MVPC Conducts Another Sham PREA Investigation of Ms. Doe's Allegations**

113.    On July 9, 2024, Ms. Doe was moved to another segregation unit reserved for disciplinary housing. While there, an ICE officer making rounds originally ignored Ms. Doe's requests to speak with him, instead asking her whether she had been in a fight. Eventually, after Ms. Doe explained that she had been moved to the unit after Melhorn peered into her cell as she used the bathroom, the officer spoke to her and made notes about that conversation.

114.    Within a day or two of that conversation, Koegler came to interview Ms. Doe.

115.    Once again, the interview was conducted in English. Once again, it was short, with no follow up questions.

116.    On July 31, 2024, Koegler prepared a form once again deeming Ms. Doe's allegations unsubstantiated.

117.    Koegler presented the document to Ms. Doe on August 2, 2024, and told Ms. Doe that there was not enough evidence to support her allegations.

118.    Following the decision deeming Ms. Doe's allegations unsubstantiated, Ms. Doe continued to see mental health practitioners who documented her persistent anxiety and her nightmares and flashbacks about Melhorn.

119.    On August 27, 2024, counsel for Ms. Doe submitted a PREA complaint on her behalf. The complaint detailed Melhorn's sexual abuse of Ms. Doe and the inadequate investigation process in response to Ms. Doe's two previous complaints.

120.    On August 29, 2024, counsel for Ms. Doe submitted to ICE a request for Ms. Doe's release from detention based on, among other things, Melhorn's sexual abuse.

121.    ICE knew—or should have known—about Melhorn's sexual misconduct generally, and his conduct with Ms. Doe specifically, based on multiple sources of information, including:

      a.   At least two different female staff members at MVPC complained about Melhorn's sexual misconduct;

      b.   ICE received—or should have received—notice of the PREA investigation initiated in April 2024 regarding Ms. Doe's allegations;

      c.   ICE received—or should have received—notice that Ms. Doe was transferred into protective custody after the July 5, 2024, incident with Melhorn based on her vulnerability to sexual abuse; and

      d.   ICE received—or should have received—notice of the PREA investigation initiated in July 2024 regarding Ms. Doe's allegations.

122.    Despite this information known and/or available to ICE, at no time before August 29, 2024, did ICE undertake any of the actions mandated by DHS regulations, including any measures to remedy the sexual abuse or to provide Ms. Doe with access to U nonimmigrant status information.

123.    On August 30, 2024, the day after Ms. Doe's counsel requested her release, ICE released Ms. Doe from detention.

**G.    Ms. Doe's Substantial Damages**

124.    As a direct and proximate result of the above-described conduct, Ms. Doe suffered substantial damages.

125.    Throughout her time at MVPC, she experienced emotional and mental distress, including but not limited to, headaches, anxiety, depression, nightmares, and difficulty sleeping and insomnia as well as physical pain and suffering.

126.    While detained at MVPC, Ms. Doe sought to engage in the exercise of her religion by attending church services and receiving pastoral guidance from a member of the clergy, but the desired exercise of her religion was substantially burdened by Melhorn's conduct. This burden that prevented her from exercising her religion caused Ms. Doe additional emotional pain and suffering.

127.    Following her release from detention, the harms Ms. Doe suffered have continued as she has been required to take medication for depression, anxiety, and difficulty sleeping. She has been diagnosed with Post-Traumatic Stress Disorder and is reasonably likely to continue to experience substantial pain and suffering.

## V.    Causes of Action

### Count 1
### Plaintiff v. Defendant United States of America
### Federal Tort Claims Act – Negligence

128.    ICE and its employees owed a duty to Ms. Doe, breached their duty to Ms. Doe, and, as such, were a direct and proximate cause and a substantial factor in bringing about Ms. Doe's damages outlined above.

129.    In particular, ICE and its employees violated their duty to Ms. Doe by:

    a.    Failing to respond to and remedy the known pattern of sexual abuse of women held in immigration detention at MVPC;

    b.    Failing to address the known issue of surveillance camera blind spots found throughout MVPC;

    c.   Failing to address the need for specialized training of MVPC staff regarding the investigation of sexual abuse allegations; and

    d.   Failing to ensure the provision of information regarding U nonimmigrant status.

130.    These actions and inactions constitute the tort of negligence under the laws of the Commonwealth of Pennsylvania.

131.    Under the Federal Tort Claims Act, defendant United States of America is liable for these actions.

**Count 2**
**Plaintiff v. Defendant United States of America**
**Federal Tort Claims Act – Negligent Supervision**

132.    ICE and its employees had a duty to ensure that MVPC staff protected immigrant detainees at MVPC from sexual abuse and knew or had reason to know that MVPC staff were unfit or not competent to protect immigrant detainees from sexual abuse.

133.    ICE and its employees knew that the incompetence and/or unfitness of MVPC staff was reasonably likely to lead to a risk of harm to MVPC detainees like Ms. Doe, and, therefore, proximately caused Ms. Doe's damages.

134.    These actions and inactions constitute the tort of negligent supervision under the laws of the Commonwealth of Pennsylvania.

135.    Under the Federal Tort Claims Act, defendant United States of America is liable for these actions.

**Count 3**
**Plaintiff v. Defendants Melhorn and GEO**
**Assault and Battery**

136.    Defendant Melhorn, by his actions in engaging in unwanted touching of Ms. Doe, intended to place Ms. Doe in imminent apprehension of harmful or offensive contact, caused Ms. Doe such imminent apprehension, and caused her to suffer harmful or offensive contacts.

137.    Melhorn's actions constitute the torts of assault and battery under the laws of the Commonwealth of Pennsylvania.

138.    Defendant GEO is vicariously liable for these actions under the doctrine of *respondeat superior*.

**Count 4**
**Plaintiff v. Defendants Melhorn and GEO**
**Intentional Infliction of Emotional Distress**

139.    Defendant Melhorn's conduct with Ms. Doe was outrageous and extreme. Melhorn acted intentionally or in deliberate disregard of Ms. Doe's emotional distress, and, as a direct and proximate result, she suffered severe emotional distress which manifests itself in physical symptoms.

140.    These actions and inactions constitute the tort of intentional infliction of emotional distress under the laws of the Commonwealth of Pennsylvania.

141.    Defendant GEO is vicariously liable for these actions under the doctrine of *respondeat superior*.

**Count 5**
**Plaintiff v. Defendants Melhorn and GEO**
**False Imprisonment**

142.    Defendant Melhorn**,** without legal cause and without Ms. Doe's consent, deprived

Ms. Doe of her liberty holding her in place in her cell while engaging in sexually abusive

conduct as described above in ¶ 67 among other factual allegations.

143.    These actions and inactions constitute the tort of false imprisonment under the

laws of the Commonwealth of Pennsylvania.

144.    Defendant GEO is vicariously liable for these actions under the doctrine of

*respondeat superior*.

**Count 6**
**Plaintiff v. Defendants Melhorn and GEO**
**Intrusion Upon Seclusion**

145.    Melhorn intentionally intruded upon Ms. Doe's private living space while she was

secluded therein and engaged in invasive conduct without Ms. Doe's consent as described above

in ¶¶ 66-69 among other factual allegations.

146.    These actions and inactions constitute the tort of intrusion upon seclusion under

the laws of the Commonwealth of Pennsylvania.

147.    Defendant GEO is vicariously liable for these actions under the doctrine of

*respondeat superior*.

**Count 7**
**Plaintiff v. Defendants Melhorn and GEO**
**Negligence**

148.    Defendant Melhorn owed a duty to Ms. Doe, breached that duty to Ms. Doe by

engaging in sexually abusive conduct, and, as such, was a direct and proximate cause and a

substantial factor in bringing about Ms. Doe's damages outlined above.

149.    These actions and inactions constitute the tort of negligence under the laws of the Commonwealth of Pennsylvania.

150.    Defendant GEO is vicariously liable for these actions under the doctrine of *respondeat superior*.

### Count 8
### Plaintiff v. Defendants Koegler and GEO
### Negligence

151.    Defendant Koegler owed a duty to Ms. Doe, breached that duty to Ms. Doe by failing to engage in a reasonably appropriate investigation of Ms. Doe's allegations of sexually abusive conduct, and, as such, was a direct and proximate cause and a substantial factor in bringing about Ms. Doe's damages outlined above.

152.    These actions and inactions constitute the tort of negligence under the laws of the Commonwealth of Pennsylvania.

153.    Defendant GEO is vicariously liable for these actions under the doctrine of *respondeat superior*.

### Count 9
### Plaintiff v. Defendant GEO
### Negligence

154.    Defendant GEO owed a duty to Ms. Doe to ensure the establishment and implementation of appropriate procedures to prevent and investigate sexual abuse, breached that duty to Ms. Doe, and, as such, was a direct and proximate cause and a substantial factor in bringing about Ms. Doe's damages outlined above.

155.    These actions and inactions constitute the tort of negligence under the laws of the Commonwealth of Pennsylvania.

**Count 10**
**Plaintiff v. Defendant GEO**
**Negligent Supervision, Hiring, and Retention**

156.    Defendant GEO owed a duty to Ms. Doe to properly supervise, hire, and retain employees, contractors and/or volunteers; breached that duty to Ms. Doe; and, as such, was a direct and proximate cause and a substantial factor in bringing about Ms. Doe's damages outlined above.

157.    These actions and inactions constitute the tort of negligent supervision, hiring, and retention under the laws of the Commonwealth of Pennsylvania.

**Count 11**
**Plaintiff v. Defendants Melhorn, Koegler, and GEO**
**Violation of Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1**

158.    Defendants Melhorn, Koegler, and GEO were acting as instrumentalities of the United States in operating an immigration detention facility and, in that capacity, substantially burdened Ms. Doe's exercise of religion.

159.    These defendants' actions and inactions violated the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1, and, as such, defendants are liable to Ms. Doe.

WHEREFORE, plaintiff Jane Doe respectfully requests:

A.      Compensatory damages as to all defendants;

B.      Punitive damages as to defendants GEO, Melhorn, and Koegler;

C.      Reasonable attorneys' fees and costs as to all defendants;

D.      Such other and further relief deemed just and appropriate.

Plaintiff hereby demands a jury trial as to Counts 3 through 11.

/s/ Jonathan H. Feinberg
Jonathan H. Feinberg
I.D. No. 88227
KAIRYS, RUDOVSKY, MESSING,
   FEINBERG & LIN LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA 19106
(215) 925-4400
jfeinberg@krlawphila.com


Trina Realmuto*
Kristin Macleod-Ball*
NATIONAL IMMIGRATION
      LITIGATION ALLIANCE
10 Griggs Terrace
Brookline, MA 02446
(617) 819-4447
trina@immigrationlitigation.org
kristin@immigrationlitigation.org

*Counsel for Plaintiff*

*Application for pro hac vice admission
forthcoming*